No. 18,915.

MRS. ELLA SIMS, *Appellee*, v. WILLIAMSBURG TOWN-SHIP, *Appellant*.

SYLLABUS BY THE COURT.

1. DEFECTIVE HIGHWAY—*Creek Bank—No Barriers—Negligence a Question of Fact.* The evidence considered and *held:*

A. It was a question of fact for the jury and not a question of law for the court whether or not a highway with a stone retaining wall along the side next to a steep creek bank was defective for want of a barrier of some kind to check or restrain frightened horses from going over the wall.

SAME—*Proximate Cause of Injuries.*

B. The defect in the highway was the proximate cause of injuries suffered by the plaintiff when the horse which she was driving became suddenly frightened at an approaching automobile and backed over the wall.

SAME—*Notice to Township of Defect.*

C. The conditions being such that injury to users of the highway was reasonably and naturally to be anticipated, actual knowledge of the conditions obtained by the township trustee by personal observation while repairing the road constituted notice of defect.

SAME—*No Evidence of Contributory Negligence.*

 D.  The court properly declined to submit the subject of contributory negligence on the part of the plaintiff to the jury.

2. VERDICT—*Not a "Quotient" Verdict.* The decision in the case of *Campbell v. Brown*, 85 Kan. 527, 117 Pac. 1010, authorized the court to approve the general verdict, complained of as a quotient verdict.

Appeal from Franklin district court; CHARLES A. SMART, judge. Opinion filed June 6, 1914. Affirmed.

*F. A. Waddle, Walter Pleasant,* and *W. B. Pleasant,* all of Ottawa, for the appellant.

*W. J. Costigan,* of Ottawa, and *Guthrie, Gamble & Street,* of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

 BURCH, J.: The action was one to recover damages for injuries to the plaintiff resulting from a defective highway. The plaintiff recovered, and the defendant appeals.

The plaintiff was seated in a buggy, driving a single horse eastward toward her home. The highway ran for some distance along the north bank of a creek. The south side of the highway was supported by a stone wall some two hundred feet long, varying in height from one to five feet, and by an earth wall extending about one hundred feet further. At the place in controversy the stone wall was two and one-half or three feet high. From the foot of the wall downward the bank was steep, and the perpendicular distance from the top of the wall to the creek was about eleven and one-half feet. The sloping bank was rocky and rough. Trees grew upon it with branches overhanging the wall. From a photograph admitted to be correct it appears that the wall was overtopped by undergrowth. The traveled portion of the highway was twenty-two feet in width, was smooth, and was level with the top of the wall, which was not marked or protected by a barrier

of any kind. The plaintiff met an automobile coming from the east, and when near it her horse suddenly shied and backed over the wall. The buggy turned upside down, the horse landed on top of it, and the plaintiff was thrown or tumbled farther down the declivity. The incident occurred on November 27, 1911.

The testimony given at the trial by the township trustee is abstracted as follows:

"During the fall before Mrs. Sims was hurt, we, the board, under my management, had graded up the road by cutting away the bank on the north side and putting earth over on the south side. The retaining wall seemed to settle down a bit along there and we put more dirt in to make a level road. I knew there was no barrier on the south side of the roadway. I knew that for several weeks before this injury. We had not done anything to prevent horses from shying or backing over the rocks on the south side of that road. It was left entirely exposed and unguarded.

"I was entirely familiar with the road and had knowledge of its condition."

The defendant insists that the highway was not defective, and embodies in its argument a quotation contained in the opinion in the case of *Murray v. Woodson County*, 58 Kan. 1, 48 Pac. 554, which reads as follows:

" 'That which never happened before, and which in its character is such as not to naturally occur to prudent men to guard against its happening at all, can not, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening and guarding against that remote contingency.' " (p. 6.)

It is not possible for the court to declare as a matter of law that an occurrence of the kind under consideration was not naturally to be anticipated and that reasonable prudence did not require a barrier to be placed along this wall, or other measure be taken, to protect users of the highway from injury. The question was one of fact for determination by the jury, and in the opinion of the jury and of the trial court the highway

was defective and dangerous and the township was negligent in maintaining it in the condition which confronted the plaintiff.

It is said that the trustee's familiarity with the road and knowledge of its physical condition did not constitute notice of a defect within the meaning of the statute imposing liability on the township. The cases of *McFarland v. Emporia Township,* 59 Kan. 568, 53 Pac. 864, and *Hari v. Ohio Township,* 62 Kan. 315, 62 Pac. 1010, are cited.

In the McFarland case the side of a highway along a river bank was protected by a fence, and the attention of the trustee was not directed to any insufficiency of the fence as a barrier. The court said that under ordinary circumstances it would seem that the fence would be ample warning to keep persons driving along the road from running off the bank and to check horses until they would see and avoid the danger. What it was that impelled the horses to run over and break down the fence was a mystery which had not been explained. The township trustee was not bound to guard against all possible contingencies and improbable conduct, but only such dangers as he was notified of; and the conclusion was that the knowledge he had was not equivalent to the statutory notice.

In the Hari case the distinction was drawn between constructive notice, or notice inferred from conditions open to observation for a considerable period of time, and actual notice derived from information or observation. Here the trustee had full actual knowledge, obtained from personal observation made while repairing the road at the identical place a few weeks before the plaintiff was injured. There was no fence at all, or other barrier, to put a driver on guard or to restrain a startled horse. In the ordinary course of events injury was reasonably to be anticipated from leaving the stretch of road along the retaining wall altogether unprotected. To those upon whom rested the duty of

keeping the highway free from defects the conditions themselves fairly spelled danger, and knowledge of the conditions was knowledge of a defect in the road.

It is said that absence of a barrier along the road was not the proximate cause of the plaintiff's injury, and the case of *Eberhardt v. Telephone Co.,* 91 Kan. 763, 139 Pac. 416, is cited. In that case it was said:

"It is entirely plain that had the mules not become frightened and had they not also got beyond the driver's control, the wire would have had no possible connection with the most regrettable injury. The party placing the wire four feet and four inches from the pole in the grassy embankment north of the traveled portion of the road can not be held to have foreseen that a team might become frightened twenty rods east thereof and run upon the embankment." (p. 765.)

The present case is governed by that of *Mosier v. Butler County,* 82 Kan. 708, 109 Pac. 162 (distinguished in the Eberhardt case), where it was said:

"There is a further contention that the defective condition of the bridge was not the proximate cause of the injury, for the reason that the horse was frightened at the pile of stone in the highway. In support of this the defendant relies upon the well-known principle that if two distinct causes are successive and unrelated in their operation one of them must be the proximate and the other the remote cause. But the principle has no application here, because it is obvious that the two causes were related in their operation. Notwithstanding the frightening of the horse, the injury would not have resulted if the guard rail had not been defective. One reason why guard rails were necessary was the liability that horses might be frightened while on this part of the bridge, resulting in just such accidents." (p. 709.)

The testimony was that the horse was an old family horse, blind in one eye, well broken, gentle, and considered perfectly safe. The plaintiff had driven him frequently. He always responded to her control, and she never had any difficulty with him. She had driven

him by machines (automobiles), and he had never frightened before. He had never frightened at railroad cars or anything while she was driving him, and she had never used a whip on him. She carried no whip. She testified as follows:

"I was driving along there on the right side of the road, driving like I always did holding the reins lightly, when I saw an automobile coming. Suddenly the horse seemed to get frightened and he shied around and backed over the embankment before I had time to do anything. We went straight over to the best of my remembrance. It was mighty quick. . . . I should judge the automobile was within about forty feet of me when the horse took fright. It was coming down the hill toward me. He shied and backed and all was over before I hardly knew anything. No, he did not attempt to whirl around and go in the other direction, just seemed to shy to the right and back and all went over the bank before I hardly knew what was happening."

The driver of the automobile testified that the horse frightened suddenly, that the plaintiff was busy trying to keep him in the road, that she slapped him with the reins to no effect, and that she had no time to signal. He stopped his car as soon as he could after the horse became frightened. In view of this testimony the court declined to submit the subject of contributory negligence on the part of the plaintiff to the jury.

The conduct of the horse was quite contrary to what the plaintiff had the right to expect when she started on her journey, and she had no occasion to anticipate that she might need a whip. Although she held the reins lightly, according to her habit, before the horse took fright, grasping them firmly would not have prevented him from taking fright, and after that she made all possible use of them. She had no occasion to signal the driver of the automobile before the horse took fright. After that she had no opportunity to do so, and it would have done no good. The defendant has no other

criticism to make of the plaintiff's conduct, and the action of the district court is approved.

The foregoing observations are sufficient to dispose of the various objections made to the instructions given the jury.

The jury returned a general verdict for $2000, and special findings of fact allowing $1000 for pain and suffering and $1000 for permanent injuries. On the hearing of the motion for a new trial two of the jurors sent in affidavits that the verdict was a quotient verdict rendered under an agreement made in advance to abide by the result of the addition and division. Three jurors made affidavits emphatically denying the existence of any such an agreement and six others were examined and cross-examined orally to the same effect. The testimony of the twelfth juror was not obtained. One juror testified as follows :

"Q. Now tell us how that verdict of $2,000 was arrived at. A. Well, someone spoke, if I remember right about how we would start, and he said we could n't give her what she asked because it was too much, and then someone said if we would all put down the amount we thought was best, and add them up and divide by twelve it might give us some basis to start on and see how near we could come together, and we did that. I forgot what the amount was, but it was over $1900.00 and after that if I remember right, someone moved that we give her $2,000.00 and we took a vote on that and it was unanimous."

Another juror testified as follows:

"We were all in favor of damages, but the amounts run from $500.00 to $3,500.00 and then they finally cast another ballot and then it was added up and divided by twelve, and when they counted it up it was $1,983 and some cents, if I remember right. Then the foreman wanted us to get together, and he rose up and he says 'All of you who are willing it should be $2,000.00 stand up, or raise your hands'—I forget which it was, and we voted on that, and we all voted $2,000.00, and then he said 'Is that your verdict?' and we all said yes. He says 'Are you all willing to vote $2,000?' and they all

agreed to it, and that was the verdict, and that man Thummel was the first man to say 'I am satisfied.' Now gentlemen that is the way I understood it."

Answering the court, another juror testified as follows:

"Someone suggested the adding and dividing, but I do not know who. We had balloted on the condition of the road but not on the amount; I think we had discussed the amount; I think somebody had suggested some amount and the foreman said, 'Gentlemen let each and every one of us put down on a ballot what we think she ought to have,' and we did so. The reason he gave was to get together and see where we stood; how each one stood; it rsulted in $1983.

"Q. Why did not you leave the verdict right there? A. Well, we were not voting for the damage then."

The trial court made no finding that there was an agreement in advance that the quotient should be the verdict of the jury, as occurred in the case of *Ottawa v. Gilliland,* 63 Kan. 165, 65 Pac. 252, and approved the verdict under the authority of the case of *Campbell v. Brown,* 85 Kan. 527, 117 Pac. 1010. The following paragraph from the opinion in the Campbell-Brown case is applicable to the method by which the amount specified in the general verdict was reached.

"While this proceeding apparently included but little, if any, real discussion as to the reasons for allowing any given amount, and is not to be commended, still as verdicts are usually to some extent the result of comparison of views and compromise, we are not able to say that the one under consideration was such as must be set aside (*City of Kinsley v. Morse,* 40 Kan. 588, 20 Pac. 222), and our attention is called to no authority requiring such a holding." (p. 535.)

No attempt was made to impeach the special findings of the jury, and for all that appears in the abstract the whole subject may have been canvassed when they were agreed to.

The judgment of the district court is affirmed.